IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

W.C., by and through his parent, his
next friend and his parent personally
SUE C.,

    Plaintiffs,

     v.

COBB COUNTY SCHOOL
DISTRICT,

    Defendant.

CIVIL ACTION FILE
NO. 1:04-CV-547-TWT

## OPINION AND ORDER

This is an action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.,* and section 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794, claiming that the Cobb County School District has not provided W.C. a free and appropriate public education. It is before the Court on the Defendant Cobb County School District's Motion for Summary Judgment [Doc. 41]. For the reasons set forth below, the Defendant's motion is GRANTED.

T:\ORDERS\04\WC\msjtwt.wpd

# I. PROCEDURAL HISTORY

On July 30, 2003, the Plaintiff, W.C.,[1] filed a due process request seeking public reimbursement from the Cobb County School District for his tuition at a private school.  He alleges a denial of his right to a free and appropriate public education ("FAPE") under the IDEA in the Individualized Education Plan ("IEP") that was proposed for him by the School District for the 2003-04 school year and for the services that were provided him in previous years.   The limitations period for an IDEA claim is the two year statute of limitations that applies to personal injury actions. Mandy S. ex rel. Sandy F. v. Fulton County Sch. Dist., 205 F. Supp. 2d 1358, 1366 (N.D. Ga. 2000), aff'd, 273 F.3d 1114 (11th Cir. 2001).  Thus, only events occurring after July 30, 2001, are at issue in this proceeding.  The relevant period begins with the 2001-02 academic year, when the Plaintiff was in the fourth grade.

In response to the due process request, a State of Georgia  Administrative Law Judge ("ALJ") heard testimony and arguments from both parties and made findings of fact and conclusions of law based on this record.  The ALJ ultimately determined that the Plaintiff had been provided with a FAPE and that reimbursement for private school placement was not warranted.  The Plaintiff appealed that decision to this

---

[1]W.C.'s mother is also a plaintiff in this lawsuit, but for the sake of simplicity, the Court refers only to W.C.

Court and further alleged a violation under section 504 of the Vocational Rehabilitation Act of 1973.  For actions brought pursuant to the appeals procedure in the IDEA, the district court: "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The Plaintiff submitted an untimely Motion to Submit Additional Evidence, which was denied  by the Court. The Defendant has filed this Motion for Summary Judgment.

## II.  SUMMARY JUDGMENT STANDARD

A district court may decide an IDEA case at summary judgment even where facts are in dispute, based on the preponderance of the evidence.  Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1313 (11th Cir. 2003).  Thus, the usual summary judgment rules under Fed. R. Civ. P. 56 do not apply.  Id.  In reviewing an ALJ's decision, "due weight" should be given to the determinations made during the administrative hearing.  Board of Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206 (1982).  The court must consider the administrative findings of fact, but has the discretion to accept or reject them.  Doe v. Alabama State Dept. of Educ., 915 F.2d 651, 657 n.3 (11th Cir. 1990); Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857 (11th Cir. 1988).  When

exercising this discretion, the Eleventh Circuit has further noted that a district court is required to respect an ALJ's findings when they are "thoroughly and carefully made." Cory D. ex rel. Diane D. v. Burke County School Dist., 285 F.3d 1294, 1298 (11th Cir. 2002). To prove by a preponderance of the evidence "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." U.S. v. Trainor, 376 F.3d 1325, 1331 (11th Cir. 2004) (citing Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993)).

## III. FINDINGS OF FACT

Having reviewed the administrative record under the foregoing standard, this Court credits the ALJ's findings of fact and holds that they are supported by a preponderance of the evidence. The Plaintiff, W.C., is a resident of the Cobb County School District. He has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), episodic dyscontrol syndrome and Asperger's Syndrome – an autism spectrum disorder that results in an inability to process information relevant to social interactions. While in pre-kindergarten, the School District determined that the Plaintiff was eligible to receive special education services under the eligibility category of Emotional/Behavior Disorder. From then up until second grade, the Plaintiff was placed in self-contained classrooms with other non-handicapped

students.  The School District conducted annual  IEP meetings to assess his progress. Then, during the first semester of second grade, the Plaintiff displayed increasingly disruptive and violent behaviors, including throwing furniture, throwing pencils at classmates, attempting to overturn file cabinets on top of other students, and headbutting and punching his teacher.  He was again evaluated and his eligibility status was changed to Severe Emotional/Behavior Disorder.  He was then transferred to a psychoeducational program within the School District known as H.A.V.E.N Academy.

H.A.V.E.N. is a program  designed to help disabled students acquire improved social and behavioral skills.  It begins as an in-center program where students receive intensive services and instruction in these areas.  Once they achieve a level of fluency in those skills, the students have the opportunity to apply and practice their skills in transition or merit classrooms that are located in regular schools.  As appropriate, the students also have the opportunity to access regular education classes in these schools. Once they have achieved a higher level of mastery of the appropriate social and behavioral skills in the merit classrooms, the students may return to their home schools.

As part of its educational program, H.A.V.E.N. utilizes a token economy system, where the students earn points or lose points based on their behavior.  The

system is individualized to the particular behavioral objectives of each student.  A student can use his points to buy items from the school store or buy special privileges. This kind of system is effective for students with autism because it can be generalized so that the student can use his points to access privileges meaningful to him.  The School District's H.A.V.E.N. program has proven extremely successful in transitioning students to less restrictive environments.  Over the past three years, 150 students have exited the program and of these, very few have returned.  All members of H.A.V.E.N.'s staff undergo a five-day workshop to become familiar with the program and all of its teachers are certified.

The Plaintiff was first diagnosed with Asperger's Syndrome by his psychiatrist, Dr. Carpenter, in March of 2001 during fourth grade.  As a result of this new information, the School District conducted a new evaluation and drafted an addendum to the Plaintiff's previous psychological evaluation.  The school's psychologist made recommendations to modify the Plaintiff's home and educational setting to address his needs.  The School District was already providing for many of these recommendations through the token system at H.A.V.E.N. Academy.  The school subsequently convened a meeting of the Plaintiff's IEP committee and drafted an addendum to his IEP based on this new diagnosis.  The committee, which included the Plaintiff's mother, agreed that this IEP was appropriate.

A.    <u>Fourth Grade</u>

During fourth grade, the Plaintiff continued to attend the H.A.V.E.N. program, as specified in his most recent IEP.  He began the year in a merit classroom at Sedalia Park Elementary, taught by a former H.A.V.E.N. instructor, Ms. Hudacko.  She had a masters degree in special education and professional teaching experience in other psychoeducational programs.  The Plaintiff's behavior in the fall semester required two returns to the Fitzhugh Lee School, the in-center location for H.A.V.E.N. students.

In December, he went back to Sedalia Park and remained there for the rest of the year.  The classroom never contained more than ten students and always included a paraprofessional to assist the teacher.  The Plaintiff and his classmates used daily point sheets to identify daily goals, and at the end of the day, the teacher would conference individually with each of them and determine the amount of points they had received.  The students took home a note each day reflecting this. The Plaintiff received academic instruction in the merit classroom and attended regular education classes such as art and P.E.  The Plaintiff had trouble with the noise in P.E., but did "extremely well" in the class according to Ms. Hudacko.  The Plaintiff also had trouble with the noise in the cafeteria, but the School District made accommodations

for him by allowing him to watch television in the lunchroom or to eat in his classroom.

Academically, the Plaintiff was expected to do the same level of work as regular education students. His work was guided by the Georgia Quality Core Curriculum, which applies to all regular education students. The merit classroom teacher modified his assignments to meet his individual needs, but the outcome of the assignments was the same. To improve his behavioral development, the Plaintiff also participated in a weekly social skills group, led by a social worker. The students watched videos, had discussions, received instruction, and participated in role playing exercises to improve their social skills. The Plaintiff was also allowed to use a computer game to match emotions with facial expressions. The Plaintiff had the further opportunity to practice these social skills in the community during monthly field trips designed to reinforce principles that were being taught in class. For example, the class went to the grocery store to learn about measurements and to the book store to learn about reference materials.

The H.A.V.E.N. program employed several strategies to address the Plaintiff's behavioral difficulties. The program helped the Plaintiff develop techniques to help him deal with his anger. For example, when he became upset, he would sometimes walk on the track next to his classroom. He also learned to calm down by sitting on

the couch in the classroom and reading almanacs and dictionaries.  His teachers adapted the token system to fit this personal interest, allowing him to use his points to buy a favorite map from the school store.  He also worked with an interventionist to discover de-escalation strategies during times when he was not on task and refused to follow directions.  When the Plaintiff's bad behavior escalated to the point that he became a distraction to the teacher and the other students, the school engaged him in a process called "intensive intervention."  This is a technique utilized in the H.A.V.E.N. program that provides for one-on-one teaching by another professional, while allowing the classroom teacher to continue attending to other students.  The student is allowed as much or as little time as necessary to de-escalate and regain control.  As the fourth grade year progressed, the number of intensive interventions involving the Plaintiff decreased.  His behavior did, however, require twelve intensive interventions over the course of the school year.  (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 36.)

      B.    <u>Fifth Grade</u>

The annual review of the Plaintiff's IEP in January 2002 revealed that he had mastered three of his written expression goals and made good progress on his behavioral goals.  At this time, the IEP committee developed new goals for the upcoming school year, including maintaining verbal and physical control, raising his

hand to get the teacher's attention, refraining from picking scabs, and staying on task for 30 minutes.  The purpose of these new goals was to improve the Plaintiff's ability "to generalize his skills and to display appropriate behavior across settings." (ALJ's Final Decision, at 16.)  The committee concluded that the Plaintiff continued to need the support of the H.A.V.E.N. program, but could attend Sedalia Park and be in the same classroom with the same teacher.  The Plaintiff's mother signed the IEP, indicating her agreement with it.

In the fall of his fifth grade year, the Plaintiff had difficulty adjusting and displayed behaviors that required him to return to Fitzhugh Lee three or four times. The Plaintiff's mother informed his teacher that this was due to the onset of puberty and an adjustment in medication by his psychiatrist.  The merit classroom teacher continued to work with him on his behavior and noted that his ability to maintain physical control had improved.  His final return to Fitzhugh Lee occurred, however, following an incident at the school library where he threw a book and pushed a door into a teacher, causing her to fall down.  This led to a charge in juvenile court, which was later dropped.  Shortly thereafter, in response to the Plaintiff's mother's request that he no longer be transitioned between classrooms, the Plaintiff stayed at Fitzhugh Lee for the remainder of the school year.

While at Fitzhugh Lee, the Plaintiff again demonstrated behavioral improvements.  The teacher successfully worked with him on maintaining personal body space and communicating his emotions when something was bothering him.  By the end of the year, his behavior had demonstrated such marked improvements that he had earned the responsibility of delivering his classroom attendance to the attendance office and for going to the fax room to retrieve messages for his teacher. He had also mastered two of the behavioral goals on his IEP, to stop picking scabs and to use appropriate voice tones, and had made "solid" progress on the others.  Also, after February, he required no more intensive interventions for the remainder of that school year.  Significantly, from the end of October through the summer term, he demonstrated no instances of physical aggression other than a single incident where he crumpled up a piece of paper containing math work.  He also demonstrated academic progress during that year.  In March 2003, he took the Iowa Test of Basic Skills, achieving an overall composite score in the 50th percentile nationally.  This progress was further demonstrated by his final report card, which showed A's in each subject.

C.    Proposal for Sixth Grade

The School District proposed sixth grade placement for the Plaintiff at McCleskey Middle School as part of H.A.V.E.N. Academy's dual diagnosis program.

Students in this program are typically on the autism spectrum but also exhibit significant behavioral problems. The program uses a treatment team model, which involves the student's teacher, paraprofessionals and social worker meeting regularly to assess the student's performance and the efficacy of his educational plan. Daily data is taken regarding the student's progress, and social workers and teachers communicate regularly with parents. The class typically consists of about eight students, a teacher and at least two paraprofessionals. If students in the class make progress, they have the opportunity to attend regular classes. The class operates on the token economy system and is individually tailored to fit the needs of the particular student. The class also provides opportunities for appropriate social skills training with the teacher, and the program's social worker makes weekly visits to conduct further training in this area.

The Plaintiff and his mother visited the classroom and his mother spoke with the teacher, Jay Parsons, about the details of the class and the program. Both she and Mr. Parsons described this visit as "very positive." The School District then created the Plaintiff's IEP for the sixth grade year, placing him in Mr. Parsons's classroom for the entire school year and allowing him to access general education classes as appropriate. However, the Plaintiff's mother had several objections and refused to sign the IEP. She first objected to the IEP because she did not want law enforcement

to be contacted under any circumstances.  She was also concerned about the possibility that her son would again be transitioned between schools, even though the IEP explicitly stated that he would remain in Mr. Parsons's classroom for the entire year.  Prior to the start of his sixth grade year, she withdrew the Plaintiff and enrolled him at the Lionheart School, a private school.

## IV. DISCUSSION

A.    IDEA Claims

The IDEA's stated purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  To accomplish this purpose, state and local educational authorities are required to identify and evaluate children with disabilities and develop IEPs for each disabled child.  See 20 U.S.C. § 1411; Mandy S., 205 F. Supp. 2d at 1366.  If the parents of the disabled child are dissatisfied with that IEP, the educational agency is required to give them an impartial due process hearing.  20 U.S.C. § 1415(f).

The Supreme Court has identified the following two part inquiry for determining whether the School District has met the IDEA's requirements for a FAPE.

> First, has the State complied with the procedures set forth in the Act?
> And second, is the individualized educational program developed
> through the Act's procedures reasonably calculated to enable the child
> to receive educational benefits?  If these requirements are met, the State

has complied with the obligations imposed by Congress and the courts can require no more.

Rowley, 458 U.S. at 206-07.  As an initial matter, the Court finds that the School District has met IDEA procedural standards by providing the Plaintiff with an IEP that complied with the requirements of 20 U.S.C. § 1414(d)(1)(A)(I); see JSK v. Hendry County Sch. Bd., 941 F.2d 1563, 1571 (11th Cir. 1991).  The Plaintiff's IEP for the 2001-02 and 2002-03 academic years, as well as his proposed IEP for the 2003-04 year, included a statement of his present academic level, a statement of measurable annual goals, a description of how his progress towards meeting those goals would be measured, a statement of the special education and related services he would receive, and an explanation of the extent to which his participation in regular education classes would be limited.  (See ALJ Record, at Petitioner's Ex. 64, 75, 107.)

The Plaintiff makes several objections to the ALJ's determination that he had received an appropriate public education.  He first contends that the burden of proving compliance with the IDEA should be placed upon the School District.  He also challenges the standard applied by the ALJ in defining the requirements of an appropriate education under the IDEA.  Third, he contests the ALJ's conclusions that the Plaintiff was making adequate academic and non-academic progress.  Finally, assuming that this Court agrees that the Plaintiff was denied educational benefits, he argues that his chosen private placement, the Lionheart School, was appropriate and

thus merited reimbursement from the state.  The Court will address each of these arguments in turn.

1.    Burden of Proof

In Devine v. Indian River County School Bd., 249 F.3d 1289 (11th Cir. 2001), the Eleventh Circuit ruled that where a parent attacks a program she once agreed to, she bears the burden of showing why it is inappropriate.  Id. at 1292.  The Supreme Court recently confirmed that in an administrative challenge to a student's IEP, the burden of proof is properly placed on the challenging party.  Schaffer ex rel. Schaffer v. Weast, 126 S. Ct. 528, 537 (2005).  Unresolved by that decision, however, was whether a state may override this default rule and place the burden on the school district.  Id.  The Plaintiff argues that the Georgia Department of Education has explicitly placed this burden on the school.  The Georgia Board of Education Rules state that in an administrative hearing:

> Generally, the [school district] shall bear the burden of coming forward with the evidence and burden of proof at any administrative hearing to establish that the proposed IEP is appropriate and provides FAPE.  If the parents propose a placement that is more restrictive than provided by an existing, agreed upon IEP, the parents shall bear the burden of establishing that the more restrictive environment is appropriate.

Ga. Bd. of Educ. R. 160-4-7-.18(g)(8).

The Court finds that the present case falls into the latter category, where a parent challenges an existing, agreed upon IEP.  Here, the Plaintiff's IEP committee

established an IEP and regularly met to evaluate the success of that IEP and modify where necessary.  (ALJ's Final Decision, at 2-3, 7-8, 11, 15-16.)  The Plaintiff's mother, moreover, indicated her agreement by signing each and every one of these IEPs.  (Id. at 27.)  The Plaintiff now seeks a placement more restrictive than the one provided by that IEP.  Furthermore, the Georgia Board of Education Rules provide the ALJ with the discretion to modify its general principles "in individual cases under unique and unusual circumstances as determined by the ALJ."  Ga. Bd. of Educ. 160-4-7-.18(g)(8).  This deference to the ALJ distinguishes this rule from comparable laws in other states that firmly place the burden on the school district.  See, e.g., Minn. Stat. § 125A.091, subd. 16 (2004); Ala. Admin. Code r. 290-8-9-.08(8)(c)(6) (Supp. 2004); Alaska Admin. Code tit. 4, § 52.550(e)(9) (2003); Del. Code Ann. tit. 14, § 3140 (1999).  The Court thus concludes that the ALJ acted properly in placing the burden of proof on the Plaintiff in this case.

### 2.     Free Appropriate Public Education

"In order to satisfy its duty to provide a free appropriate public education to a disabled child, the state must provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  Mandy S., 205 F. Supp. 2d at 1366 (citing Drew P. v. Clarke County Sch. Dist., 877 F.2d 927, 930 (11th Cir. 1989)).  As explicitly stated by the Supreme Court in Rowley, the Act

does not require that the school maximize a student's potential, only that it provide a "basic floor of opportunity." Rowley, 458 U.S. at 198. See also Loren F., 349 F.3d at 1312 n.1 ("The FAPE described in an IEP need not be the best possible one ... rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction."). Under the IDEA, a school district does not guarantee a particular outcome. Rowley, 458 U.S. at 192. In determining whether a student has received adequate educational benefit, moreover, the Eleventh Circuit has noted that courts should pay "great deference" to the educators who developed the IEP. JSK, 941 F.2d at 1573.

The Plaintiff argues that, in determining educational benefit, the ALJ erroneously applied an "academic only" analysis that focused on his grades and academic advancement and failed to address the behavior-centered goals in the Plaintiff's IEP. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 27.) As evidence, the Plaintiff cites to Rowley's acknowledgment in a footnote that advancing from grade to grade does not automatically mean a student is receiving an appropriate education. Rowley, 458 U.S. at 203 n.25. Nowhere does the ALJ assert or even imply, however, that academic progress is the only concern. The ALJ, citing Rowley, ruled that an "appropriate education," as required by the IDEA is one that "is provided pursuant to

an IEP that has been developed in compliance with the procedural requirements of IDEA, is designed to meet the student's specific needs, and is calculated to enable the student to receive educational benefit."  (ALJ's Final Decision, at 27-28.)  Contrary to the Plaintiff's claim of an "academic only" analysis, the ALJ merely stated that "a student's academic progress and his ability to advance from grade to grade are important factors for consideration."  (Id. at 28).  That is a correct statement of law. See Rowley, 458 U.S. at 203-204.

Furthermore, in examining the relationship between behavior and academic progress, the ALJ referenced a case similar to this one involving a child with a long history of psychiatric illness and behavioral difficulties, but without any corresponding cognitive impairments.  See C.J.N. v. Minneapolis Public Schs., 323 F.3d 630 (8th Cir. 2003), cert. denied, 540 U.S. 984 (2003).  In C.J.N., the Eighth Circuit determined that the severity of the student's behavioral problems made his academic progress "even more relevant to the educational benefit inquiry, because it demonstrate[d] that his IEPs were not only reasonably calculated to provide educational benefit, but, at least in part, did so as well."  Id. at 638.  This and other decisions cited by the ALJ demonstrate clearly that the academic progress of a student with severe behavioral problems is an important factor in determining whether he is receiving educational benefit.  See, e.g., Adam J. ex rel. Robert J. v. Keller Indep. Sch.

Dist., 328 F.3d 804 (5th Cir. 2003); Kings Local Sch. Dist., Bd. of Educ. v. Zelazny, 325 F.3d 724 (6th Cir. 2003); Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F., 118 F.3d 245 (5th Cir. 1997).[2]

These cases reflect the purpose of the IDEA expressed in Rowley, which is not to identify one uniform test for determining educational adequacy, but to ensure that all disabled students receive a "basic floor of opportunity." Rowley, 458 U.S. at 200. While certainly not the only consideration, the Court holds that, where a student has behavioral disabilities, academic progress is a significant factor in determining whether that student has received adequate educational benefits.

a.      Academic Progress

---

[2]The Plaintiff cites other case examples where courts have found that the school district's failure to achieve behavioral goals indicated that the student had not received academic benefit. See School Bd. of Collier County, Fla. v. K.C., 285 F.3d 977 (11th Cir. 2002); Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist., 375 F.3d 603 (7th Cir. 2004); Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022 (8th Cir. 2003). None of these cases held, however, that academic progress should not be considered as evidence of educational benefit. In K.C., the Eleventh Circuit held that academic progress is a component of a FAPE determination. K.C., 285 F.3d at 983. The Clark court found only minimal evidence of the student's academic and social progress and concluded that even if slight educational benefit had been achieved, that benefit was lost due to the student's behavioral problems. Finally, Alex R. involved not the student's relative success at achieving his behavioral goals, but inquired as to whether the student's IEP even addressed certain violent and disruptive behavior. Alex R., 375 F.3d at 613-15.

The Court finds significant evidence that the Plaintiff was making academic progress in both his fourth and fifth grade years.  He consistently made passing grades, earning four A's and two B's during fourth grade and all A's during his fifth grade year.  He also scored on grade level in standardized tests.  In fourth grade, he met expectations in each and every one of the subject areas and exceeded expectations in some subcategories of testing.  (ALJ's Final Decision, at 15.)  The Plaintiff, however, tries to create the impression of academic regression by pointing to test results in  specific subcategories and selectively highlighting certain negative comments from his teachers concerning his academic advancement.  (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 31-35.)  The Plaintiff points to all of the content areas where he falls below the median.  That is not the relevant standard for determining whether a student meets the state's academic expectations.  In fact, the Plaintiff met the state's expectations for competency in each of the content areas.  (ALJ's Final Decision, at 15.)  Given this evidence, this Court concludes that the Plaintiff demonstrated consistent academic progress throughout his enrollment in the Defendant's school system.

The Plaintiff also attempts to persuade this Court that his academic advancement should be discounted as evidence of educational benefit because it is consistent with his intellectual abilities.  However, as stated in C.J.N., where a

student's behavioral difficulties are severe, evidence of his academic progress is "even more relevant" in determining whether a school has been successful in educating him. C.J.N., 323 F.3d at 638.  The Plaintiff's contention, taken to its logical extreme, requires this Court to assume that the Plaintiff would progress from grade to grade simply by exposure and without the benefit of any academic training.  Were that the case, any further discussion of his IEP would be irrelevant and the School District could simply leave this young man to develop autonomously.  The Court cannot and does not accept this assertion regarding the Plaintiff's academic aptitude.  The Plaintiff's consistent advancement provides clear indication of academic progress.

b.    Non-Academic Progress

The Plaintiff also disputes the ALJ's determination that he was making progress towards his behavioral goals.  The Court acknowledges, as did the ALJ, that this progress is harder to assess.  There is, however, evidence that the School District was taking significant steps to address the Plaintiff's behavioral needs and that the Plaintiff was showing improvement in these areas.  During his time in the  H.A.V.E.N. program, the School District conducted regular IEP meetings where the plan's efficacy was assessed and goals were added based on the concerns of his teacher and his mother.  (ALJ's Final Decision, at 4, 7-9, 16, 23 -24.)  The Plaintiff's mother also signed each IEP, indicating her acceptance of it.  (Id.)  Furthermore, the Court finds

significant the decreasing average amount of time the Plaintiff spent in intensive intervention during his years at H.A.V.E.N.   The time he spent in intervention decreased significantly between his third and fourth grade years.     (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 20.)  Moreover, although he spent the same amount of time in intervention in fourth and fifth grade, the average amount of time it took him to regain control during each intervention had decreased.  This indicates an improved ability to control his behavior.  Significantly, after February, he required no more intensive interventions for the remainder of his fifth grade year.  (ALJ's Final Decision, at 20.)

The Court agrees with the findings of the ALJ that the Plaintiff demonstrated both academic and non-academic progress during his time at the H.A.V.E.N. Academy.  The record demonstrates conclusively that the Plaintiff, through his IEP, received academic benefit from his education in the School District.  Thus, the Court concludes that the School District was providing the Plaintiff with an appropriate education as required under the IDEA.

### 3.     Appropriateness of Private Placement

A student is entitled to reimbursement for a private placement only if his public school failed to provide a FAPE and he demonstrates that the private placement is appropriate to fit his needs.  20 U.S.C. § 1412(a)(10)(C).  See, e.g., Cerra v. Pawling

Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005); A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 320 (4th Cir. 2004); Gill v. Columbia 93 Sch. Dist., 217 F.3d 1027, 1037 (8th Cir. 2000).  The chosen private placement must be "reasonably calculated to enable the child to receive educational benefits."  Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 11 (1993).  Assuming that the Court had reached an opposite conclusion regarding his receipt of a FAPE, the Plaintiff also argues that the private placement chosen by the Plaintiff, the Lionheart School, was appropriate and justified reimbursement by the School District.  This Court agrees with other courts holding that the student and his parent bear the burden of demonstrating that the private placement is appropriate.  See M.S. ex rel. S.S. v. Board of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 104 (2d Cir. 2000); Linda W. v. Indiana Dept. of Educ., 200 F.3d 504, 506 (7th Cir. 1999) (citing School Comm. of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359 (1985)); Carlisle Area Sch. v. Scott P., 62 F.3d 520, 533 (3rd Cir. 1995).

Here, the Court concludes that the Plaintiff has not met his burden of demonstrating that the Lionheart School was an appropriate placement.  The Court finds significant several important facts cited by the ALJ.  First, the Plaintiff's private school is a more restrictive placement than the placements provided to the Plaintiff by the School District.  It provided no opportunity for the Plaintiff to receive education

with non-disabled peers.  (ALJ's Final Decision, at 33.)  Nor was there any indication

that this placement would eventually transition him into a less restrictive placement,

as the school has never attempted to transition any of its middle or high school

students.  Id.  The Plaintiff contends, however, that mainstreaming is not a factor

permitted for consideration by the Supreme Court or its progeny in determining the

appropriateness of a private placement.  See Cleveland Heights-University Heights

City Sch. Dist. v. Boss, 144 F.3d 391, 400 (6th Cir. 1998) (concluding that a private

placement's satisfaction of the IDEA's mainstreaming requirement was not necessary

in order for parental reimbursement).

    While not required, the IDEA maintains a strong preference for

"mainstreaming."  20 U.S.C. § 1412(a)(5); Rowley, 458 U.S. at 202-03.  Moreover,

although the Plaintiff is correct in stating that a more restrictive placement in a private

school is not an absolute bar to reimbursement, he goes too far when he claims that

the Supreme Court does not permit mainstreaming as a consideration.  Neither

Burlington nor Carter makes any mention of what factors may or may not be

considered in determining an appropriate private school placement.  In Carter, the

Supreme Court stated only that a private placement's failure to meet the IDEA's

requirements does not mean it is inappropriate.  Carter, 510 U.S. at 13.  The least

restrictive requirement remains a consideration for the hearing officer in determining

whether the parent chose an appropriate placement. <u>M.S.</u>, 231 F.3d at 105.  Thus, this Court may consider restrictiveness in determining the appropriateness of the Plaintiff's private placement.

The evidence also demonstrates that the Lionheart School's methodology and certification were inadequate to meet the Plaintiff's educational needs.  The record shows the following: (1) none of the Plaintiff's teachers had earned any teacher certification; (2) the school had been in existence for only one year and held no demonstrable history of success; (3) the Plaintiff presented no documentary evidence of his program at the school; and (4) the Lionheart School's education methods remain largely untested and unvalidated, contrary to both the federal government's stated educational preference and the program at the Plaintiff's former, state-funded school. (ALJ's Final Decision, at 33.)  The Plaintiff argues that his school is academically certified, but offers as evidence only the fact that the Lionheart School's program adhered to the National Research Council's guidelines for educating autistic students. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 43.)  Given the lack of verifiable evidence demonstrating the success of this program or of the qualification of its educators, the Court finds this evidence insufficient to demonstrate that the Lionheart School is an appropriate placement.

The Plaintiff also offers the fact that he is making demonstrable and significant educational progress at his new school as evidence that the placement is appropriate. (Compl., ¶ 19.)  Whatever behavioral or educational progress a parent may feel her child is achieving at a private placement, however, is not enough to justify requiring the state to reimburse his tuition.  See Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 n.6 (6th Cir. 2003) (noting that reimbursement under the IDEA does not depend on the "mere happenstance" of whether the child "does well" in a private placement). This Court therefore concludes that the Plaintiff's placement was not appropriate and that he is not entitled to reimbursement.

> B.      Section 504 of the Rehabilitation Act

The Plaintiff also claims that the Defendant's failure to provide him with a free and appropriate education in the least restrictive environment possible constitutes discrimination against him under section 504 of the Vocational Rehabilitation Act. 29 U.S.C. § 794(a).  Section 504 states: "No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." Id.; Manecke v. School Bd. of Pinellas County, Fla., 762 F.2d 912, 921 (11th Cir. 1985).

However, in the Eleventh Circuit, a disparate treatment claim for compensatory damages under section 504 must fail in the absence of intentional discrimination or bad faith.  Wood v. President and Trustees of Spring Hill College in City of Mobile, 978 F.2d 1214, 1219 (11th Cir. 1992).  To make a claim under section 504 in the education context, something more than an IDEA violation for failure to provide a FAPE in the least restrictive environment must be shown.  N.L. ex rel. Mrs. C. v. Knox County Schs., 315 F.3d 688, 695 (6th Cir. 2003);  Sellers by Sellers v. School Bd. of City of Mannassas, Va., 141 F.3d 524, 529 (4th Cir. 1998); Monahan v. Nebraska, 687 F.2d 1164, 1170 (8th Cir.1982).  A plaintiff must also demonstrate some bad faith or gross misjudgment by the school or that he was discriminated against solely because of his disability.  See Sellers, 141 F.3d at 529; Alex G. ex rel. Dr. Steven G. v. Board of Trustees of Davis Joint Unified Sch. Dist., 387 F. Supp. 2d 1119, 1124 (E.D. Cal. 2005); Brantley v. Indep. Sch. Dist. No. 625, St. Paul Public Schs., 936 F. Supp. 649, 657 (D. Minn. 1996).  The Plaintiff's complaint alleges only that he was denied a FAPE.  This alone is insufficient to show a violation of section 504 of the Vocational Rehabilitation Act.  Summary judgment for the Defendant is thus merited on this claim.

## V. CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 41] is GRANTED.

SO ORDERED, this 21 day of December, 2005.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge